UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


CIVIL ACTION NO. 10-30214-RWZ


DONNA A. HUTCHINSON

v.

MICHAEL J. ASTRUE,
Commissioner of the Social Security Administration


MEMORANDUM OF DECISION

May 9, 2012


ZOBEL, D.J.

Plaintiff, Donna Hutchinson, brings this action under 42 U.S.C. § 405(g) seeking

to remand a decision by defendant, the Commissioner of Social Security

Administration, that denied her application for disability benefits. Plaintiff maintains that

the Administrative Law Judge ("ALJ"), whose unfavorable May 28, 2010, decision

became the final decision of the Commissioner, erred in four respects detailed

hereafter.

**I. Social Security Disability Insurance Framework**

Pursuant to regulations promulgated by the Social Security Administration, a

person is disabled if she has an "inability to do any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); 20 C.F.R. §

416.905(a). To meet this definition, a person must have a severe impairment that

makes her unable to do her past relevant work or any other substantial gainful work

that exists in the economy. Id.

In determining disability, the Commissioner follows a five-step inquiry:

First, is the claimant currently employed? If [s]he is, the claimant is automatically
considered not disabled.

Second, does the claimant have a severe impairment? A "severe impairment"
means an impairment "which significantly limits the claimant's physical or mental
capacity to perform basic work-related functions." If [s]he does not have an
impairment of at least this degree of severity, [s]he is automatically not disabled.

Third, does the claimant have an impairment equivalent to a specific list of
impairments in the regulations' Appendix 1? If the claimant has an impairment of
so serious a degree of severity, the claimant is automatically found disabled.
....

Fourth ... does the claimant's impairment prevent [her] from performing work of
the sort [s]he has done in the past? If not, [s]he is not disabled. If so, the agency
asks the fifth question.

Fifth, does the claimant's impairment prevent [her] from performing other work of
the sort found in the economy? If so [s]he is disabled; if not [s]he is not disabled.

Goodermote v. Sec'y of Health & Human Servs., 690 F.2d 5, 6-7 (1st Cir. 1982).

The applicant has the burden of production and proof at the first four steps of the

process. Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001). If the applicant has

met his or her burden at the first four steps, the Commissioner then has the burden at

step 5 of coming forward with evidence of specific jobs in the national economy that the

applicant can still perform. Id. The ALJ's findings of fact are conclusive if supported by

substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 390

(1971); Manso-Pizarro v. Secretary of Health and Human Services, 76 F.3d 15, 16 (1st

Cir. 1996). Substantial evidence is "more than a mere scintilla. It means such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion."

Richardson, 402 U.S. 389 at 390. The Commissioner's denial is to be affirmed "even if

the record arguably could justify a different conclusion, so long as it is supported by

substantial evidence." Rodriguez Pagan v. Secretary of Health and Human Servs., 819

F.2d 1, 3 (1st Cir.1987).

## II.  Background and Administrative Record

Plaintiff applied for Disability Insurance Benefits (DIB) and Supplemental

Security Income Benefits under Titles II and XVI of the Social Security Act, 42 U.S.C.

§§ 402 et seq., on November 19, 2007. She alleged disability since May 7, 2006, from

a combination of sleep apnea, chronic asthma, breathing problems, back pain, knee

pain, chronic obstructive pulmonary disease ("COPD"), depression, diabetes and drug

abuse. Her claims were denied initially in April 2008 and upon reconsideration in

September 2008. Thereafter, plaintiff filed a written request for a hearing. An ALJ held

a video hearing in March 2010.  In May 2010, he denied plaintiff's claims. The Social

Security Administration's Decision Review Board selected plaintiff's claim for review, it

did not complete it within 90 days, and as a result, the ALJ's decision became the final

decision of the Commissioner.  It is from this decision that plaintiff now appeals.

The record sets forth the following facts:

Plaintiff is 49 years old, has a 12th grade education, and until 2007, worked as a

nurse's aid in a nursing home for approximately 12 years.  She has a long history of

drug and alcohol abuse particularly crack cocaine and marijuana, but she successfully

detoxified and had been drug free for two years as of the hearing date.  She reported

that she suffered traumatic abuse at 18 and was in an abusive relationship with a

boyfriend with whom she lived for approximately 20 years. Upon leaving that

environment, she became homeless for a period of time and stayed in shelters. She

eventually lived with a female roommate, but at the time of the hearing, she was living

alone in subsidized housing.

### A.  Plaintiff's Respiratory Conditions

Between May 2006 and January 2007, plaintiff went to the emergency room on

six occasions with complaints of shortness of breath.  The doctors who treated her

noted that she exhibited labored breathing and wheezing, that she had run out of her

asthma medication, and that she was a smoker.  They recommended that she stop

smoking.

Dr. Kristen Berman, plaintiff's primary care physician, reported that her asthma

was stable in May 2007.  On July 13, 2007, Dr. Berman noted that the asthma and

COPD were stable, but that plaintiff had not gone for a recommended pulmonary

function test or sleep study, and that she continued to smoke.[1] On this date, plaintiff

also filled out a "psycho-social assessment" in which she stated that although she was

extremely confident she could quit smoking if she tried (10/10) that she was "not

---

[1] Subsequently, in September and December 2007, plaintiff underwent sleep studies, and both confirmed her sleep apnea.

4

considering quitting" and there was "nothing at this time" that could interest her in quitting, despite recognizing a benefit would be to "breathe better."

Between July 2007 and June 2008, plaintiff was brought to the emergency room seven times for respiratory related complaints. The doctors noted mild wheezing, diminished breath sounds, moderate respiratory distress, and decreased air movement. The records indicate that she was not taking her medications and was continuing to smoke, although by June 2008 she had cut back to half a pack per day.

In January 2008, plaintiff's primary care physician noted on a form that plaintiff had not kept appointments for pulmonary function tests, had not followed up for primary care since July 2007, and had not called for medication refills since May 2007. Between February and May 2008, the plaintiff was followed by Dr. Sanjeevan Randhawa who wrote that plaintiff's lungs were "clear to auscultation."  In March 2008, plaintiff had a "COPD flare," and the home care instructions prepared by Dr. Renee Carson advised her "Absolutely no smoking!"  In May 2008, plaintiff reported to Dr. Brett Hynninen that she had not had exacerbations of asthma.  In January 2009, a physician's assistant ("PA") at Pioneer Spine and Sport still noted "personal habits cigarette use."  In July 2009, Dr. Hoffman examined plaintiff's chest and concluded the "lungs and pleural spaces are clear."

**B. Musculoskeletal Conditions**

Plaintiff has also complained of and was treated for back, knee, left shoulder, and elbow pain.

5

In October 2006, plaintiff's right knee showed no signs of swelling or deformity and had full range of motion. An X-ray of the knee taken in January 2007 showed no evidence of an acute injury.  In early February 2007, plaintiff reported to Dr. Berman that her back pain was better with activity, and he rated her lower extremity strength as four out of five noting plaintiff's sensation and gait were normal and she could easily mount and dismount the examination table. Dr. Berman noted "she is being sent to physical therapy, I am not convinced that the patient will go as it does not sound as though she is motivated to do this."

Plaintiff went to the hospital in March 2007 after she slipped on ice and hurt her left shoulder and was in mild distress and had limited range of motion. Her shoulder and elbow X-rays were negative, and she declined a back X-ray. In April  2007, plaintiff suffered another left shoulder injury while "lifting someone;" her examination again revealed no abnormal results.  A May 2007 MRI revealed "mild rotator cuff tendinosis with a small amount of joint effusion."

In May 2007, Dr. Berman noted that plaintiff had not gone to recommended physical therapy.  Dr. Berman observed that while plaintiff had pain and point tenderness, she could fully abduct her arm, that her arm strength was a five out of five and her sensation was normal.  An MRI taken shortly thereafter revealed mild rotator cuff tendinosis and a small amount of joint effusion but no muscle tear.  In July 2007, Dr. Berman wrote that the plaintiff's shoulder pain had improved.

Dr. Randhawa observed normal range of motion and no tenderness in her back in early 2008.  In May 2008, Dr. Hynninen noted that she walked without a limp and

could heel and toe walk without difficulty, that her seated leg raise was negative, that there was no weakness in her lower extremities and that her hip and knee range of motion were well preserved.

Dr. M. Douglass Poirier, a state agency physician, reviewed the plaintiff's medical records in March 2008 and concluded that plaintiff is able to lift ten pounds and occasionally lift up to 20.  She is able to sit, stand and/or walk for six hours each in an eight hour day and occasionally stoop and do overhead work, but that due to her respiratory problems should not be exposed to fumes, odors, dusts, gases or poor ventilation. Dr. Erik Purins, also a state agency physician, reviewed plaintiff's records in July 2008 and reached similar conclusions, except he restricted plaintiff to standing for only two hours per day. Both doctors allowed only occasional overhead reaching because of plaintiff's elbow and shoulder injuries.

In January 2009, the Pioneer Spine and Sport PA noted that plaintiff was last seen in May 2008 but at that time was only taking over-the-counter medication for neck and back pain.  She also observed that plaintiff did have diminished extension, was tender in her trapezius muscles, and had some back pain, but that she could heel and toe walk without issue, had no weakness in her lower extremity, tolerated hip range or motion without pain, had no gross deformities in her back and her cervical spine range of motion and light touch sensation were well-preserved.

By September 2009 plaintiff's knee condition had worsened.  Dr. Brian Hoffman initially diagnosed tendonitis and prescribed two cycles of physical therapy and anti-imflammatory medication, and the following month changed that to chronic right knee

pain. An MRI revealed mild to moderate osteoarthitis which Dr. Hoffman treated with "knee arthritus" injections. In July 2009, plaintiff had right knee arthroscopic surgery which confirmed "degenerative joint disease."  After three post-surgery appointments, Dr. Hoffman determined that she had "advanced knee arthritis" and that there is little else to offer her besides total knee arthoplasty.  He did note that post-surgery plaintiff's range of motion was "surprisingly good," that she reported the steroid injections were working to reduce her pain, and that her pain was better now than before the surgery. He also observed that plaintiff described discomfort when she "twists" and when going up and down stairs and that weight loss may help. Left shoulder X-rays in May 2009 also demonstrated "acromioclavicular osteoarthritis."

### C.  Mental Health Conditions

Plaintiff has been diagnosed with dysthymic disorder, post traumatic stress disorder, personality disorder (not otherwise specified), and polysubstance abuse. As of February 2007, she reported no past treatment for depression and estimated that she feels "low" approximately one day per month and never so severe that she feels like hurting herself or anyone else. As of May 2007, her depression was described as "stable," and treating physician Dr. Berman concluded that it was not severe enough to warrant medication.

In July 2007, plaintiff underwent a psychological assessment as part of a four-day inpatient detoxification program at Arbor House for her polysubstance abuse. The examiner found that plaintiff was depressed but had no suicidal thoughts, that she was alert and oriented and had no difficulty understanding, remembering, or concentrating.

Further, her judgment was unimpaired, speech was appropriate, thought process was normal, intellectual functioning was average, and her memory and insight were good. Here Global Assessment of Functioning ("GAF") score was 58.[2]

A comprehensive assessment performed in January 2008 noted that plaintiff was not experiencing hallucinations or suicidal ideations, her impulse control was adequate, her insight and judgment were fair, her speech was clear, and her thoughts logical although her mood and affect were described as "anxious." The clinician assigned a GAF score of 60 and identified plaintiff's problems as depression, anxiety, and sleeplessness and recommended counseling and psychiatric intervention to cope with drug addiction.

As assessment in October 2008 noted fair insight and judgment, clear speech, guarded behavior, loose thought, and an anxious mood. This time plaintiff's GAF score was 46.

Dr. Kathryn McNally, Psy.D, a psychologist, examined plaintiff on March 6, 2008, and found no evidence of a formal thought disorder. Plaintiff's scores were normal on a mental status evaluation, her concentration and recall were unimpaired, and she was marked as being of average intelligence.  Dr. McNally concluded that she is able to make simple decisions, tolerate stresses common to a work environment, and maintain attendance and a schedule although she will need some guidance interacting and communicating appropriately with supervisors and coworkers.

---

[2] A GAF score between 41 and 50 denotes serious symptoms or difficulties with social or occupational functioning. A score between 51 and 60 denotes moderate symptoms or moderate difficulties. A score of 60 and 70 indicates mild symptoms or some difficulty.

Two state agency psychologists, Dr. William Whitehorn and Dr. Ruth Aisenberg, assessed the plaintiff's mental capacity for work in March and July 2008, respectively. Both concluded that plaintiff had no limitations in understanding, adaptation or memory despite some reluctance to accept responsibility for errors or misunderstandings. Dr. Whitehorn opined that plaintiff could sustain concentration and attendance at work with routine supervision. Dr. Aisenberg agreed that plaintiff would be upset by criticism, and added that she could concentrate on routine tasks for up to two hours over an eight-hour period and would be able to understand conventional instructions.

On March 4, 2009, Dr. Thomas Weiss, a psychiatrist, observed that while the plaintiff's mood was depressed, she was not experiencing delusions, and her speech, affect, attention, orientation, and memory were normal. Her GAF score was 65.  In June 2009, it was 45.

In October 2009, Vanessa Adams, M.Ed., plaintiff's mental health clinician, completed a "psychiatric review technique form" finding marked limitations in activities of daily living, social functioning, and concentration (the "Adams report").[3]  She also noted repeated episodes of decompensation and that plaintiff had been "clean for 1 ½ years (crack)" despite "strong urges."

**D.  Administrative Hearing**

---

[3] Dr. Weiss is listed as the examiner on the first page of the report but did not sign the assessment.

Plaintiff testified that she worked for 11 to 12 years as a nurses' aide, that she worked briefly for a cleaning company, and that the last unspecified job she had was sometime in 2007.  She said that over the last four years her asthma has "been pretty under control because of the medicines," that she uses a nebulizer about twice a week in the summer months, and that she was not a smoker (it is not clear from the record when she actually quit). She takes readings of her blood sugar only once per week and takes oral medication to control her diabetes. She uses her CPAP machine nightly. She has slight scoliosis and lumbar arthritis and has been experiencing middle and upper neck problems. She noted that she had knee surgery the year before and is a potential candidate for right knee replacement.  She broke her left leg several years ago and struggles when walking and occasionally uses a cane. She testified that she takes Cymbalta for depression which gives her dry mouth at night and headaches, that she has anxiety, gets sad a lot, and gets really nervous, but has not had any mental health episodes requiring hospitalization within the last five years. She testified that she had a substance abuse problem with crack cocaine but has been clean for two years. She stated that she has pain in her knee, lower back and neck every day which she rated as an 8 when unmedicated (on a 1-10 scale and a 3 or 4 if medicated). When asked by the ALJ about difficulty with concentration, plaintiff explained that she occasionally gets sidetracked while doing word search puzzles and will have to put them down and move on to another activity, and that sometimes she does not remember if she has taken all her required medicines.

As for her daily activities plaintiff testified that she occasionally babysits her two-and three-year old grandchildren, that she frequently walks to the library (which is less than a mile from her home), cooks easy meals, does laundry once a week which requires her to bring no more than a ten-pound load of laundry up the steps from her cellar.  She also vacuums and does the dishes but standing by the sink and pulling and pushing on the vacuum can hurt her back. She can sit comfortably for a "couple of hours" but then has to reposition herself, and she raises her leg and sometimes naps during the day.

A vocational expert testified that, assuming plaintiff's limitations as presented by the ALJ, she would not be able to perform her previous work as a certified nurse's aide but could find light work or sedentary work in the local and national economy.

**E.  The ALJ's Decision**

With respect to the five-step inquiry, the ALJ found that plaintiff met the insured status requirements of the Social Security Act; that she has not engaged in substantial gainful activity since May 7, 2006 (step 1); that she had the following severe impairments: "chronic obstructive pulmonary disease (COPD); asthma; sleep apnea; rotator cuff tendinopathy; acromioclavicular osteoarthritis; back impairment; obesity; dysthymic disorder; post traumatic stress disorder (PTSD); personality disorder (not otherwise specified); history of polysubstance abuse, in remission; history of left leg fracture; and mild to moderate degenerative osteoarthritis of the medial knee and patellofemoral compartments with possible future right knee replacement surgery" (step 2). He found that plaintiff's impairments were not equivalent to any of the conditions

described in Appendix 1 of the regulations (step 3), but that she could no longer

perform any past relevant work (step 4).  At step 5, he determined that plaintiff had the

residual functional capacity ("RFC") to perform sedentary work with the added

limitations that she perform simple, unskilled tasks; avoid exposure to extreme

temperatures, humidity, fumes, dusts, gases, heavy machinery, heights, foot controls;

be exposed to co-workers and the public on a less-than-occasional basis; that she

engage in only occasional climbing of ramps and stairs; and engage in only occasional

stooping, crawling, crouching or kneeling. The ALJ found that given plaintiff's age,

education, work experience, and RFC, there were a significant number of jobs available

in the national economy such as: "inspector," "assembler" and "packaging."

        The ALJ determined that plaintiff's medically determined impairments could

reasonably be expected to cause the alleged symptoms; however, he did not credit her

statements concerning the intensity, persistence and limiting effects thereof to the

extent they were inconsistent with her ability to perform sedentary work. He found a

disconnect between the claimed disability and the objective medical record coupled

with her stated ability to manage a range of daily activities and the fact that she was

only taking over-the-counter pain medication.  He further noted that the record reflects

a "long history of non-compliance with follow-up appointments, taking her medication

as prescribed, and following through with recommended treatment."

        The ALJ discredited the Adams report in view of plaintiff's treatment history.

Even "fully crediting plaintiff's subjective allegations," its findings were inconsistent with

the record as a whole, and it rested, at least in part, on physical impairments outside

Ms. Adam's area of expertise.  Finally, had the assessment provided been true, plaintiff, according to the ALJ, "would have been forced to seek more than the generally conservative level of care" she followed.

## III.  Analysis

Plaintiff asserts four errors in the ALJ's findings and analysis:  (1) failing to analyze whether her respiratory impairments met the 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Appendix 1") criterion for asthma; (2) neglecting to include her inability to reach overhead; concentrate and keep the pace on work tasks in her residual functional capacity RFC assessment; (3) finding her not fully credible without substantial evidence supporting the determination; and (4) dismissing medical opinions without properly analyzing them or discussing their probative weight.

### A.  Appendix 1 Asthma Criterion

First, plaintiff asserts the ALJ erred in failing to evaluate whether plaintiff's asthma meets or equals the Appendix 1 criteria at step 3. If plaintiff meets an Appendix 1 listing, she would automatically be found disabled.

Plaintiff contends that she had several in-patient and many out-patient asthma exacerbations that meet or exceed the "six-attacks a year" requirement of the listing and cites ten such episodes over a one-year time frame. Although she does not explicitly cite the Appendix 1 provision, she is presumably referring to the category impairment listing for asthma found at 20 C.F.R. Part 404, Subpart P, Appendix 1, Part A, § 3.03 (B), which states:

> Asthma. With: ... Attacks (as defined in 3.00C), in spite of prescribed treatment and requiring physician intervention, occurring at least once every 2 months or at least six times a year. Each in-patient hospitalization for longer than 24 hours for control of asthma counts as two attacks, and an evaluation period of at least 12 consecutive months must be used to determine the frequency of attacks.

Section 3.00(C) further provides that:

> Attacks of asthma ... are defined as prolonged symptomatic episodes lasting one or more days and requiring intensive treatment, such as intravenous bronchodilator or antibiotic administration or prolonged inhalational bronchodilator therapy in a hospital, emergency room or equivalent setting. Hospital admissions are defined as inpatient hospitalizations for longer than 24 hours. The medical evidence must also include information documenting adherence to a prescribed regimen of treatment as well as a description of physical signs.

The Commissioner concedes that the ALJ did not specifically explain whether plaintiff's asthma attacks met the Appendix 1 listing criteria, but asserts that his step 3 finding that generally "claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in [Appendix 1]" is nonetheless supported by substantial evidence.

The Commissioner points out that several of plaintiff's attacks occurred when she was not taking her medication and that the attacks between November 14-16, 2006, should be considered "one attack lasting for more than one day" rather than two separate attacks.

His second argument runs counter to the clear wording of Appendix 1 which states "in-patient hospitalization for longer than 24 hours for control of asthma counts as two attacks." Further, since plaintiff alleges "asthma exacerbations" on

15

approximately 10 occasions, it is not clear that even if the November 2006 episodes were consolidated the number of attacks would be reduced below the requisite threshold. However, the Commissioner's first point that plaintiff was not taking her prescribed medication and to a larger extent the evidence in the record establishing that plaintiff was not following her doctor's asthma treatment advice is on better footing.

First, plaintiff contends elsewhere in her brief that she did not take her prescription asthma medications because of an inability to pay. Putting that issue aside, plaintiff was advised numerous times and unequivocally by nearly all of the doctors she saw that the best treatment was to quit smoking.

Plaintiff's continued smoking against doctor's orders is noncompliant with Section 3.00(C)'s mandate that for an asthma episode to count as a qualified "attack" the "medical evidence must also include information documenting adherence to a prescribed regimen of treatment... " Kennedy v. Apfel, CV 98-4196 (RJD), 1999 WL 684155, at *3-5 (E.D.N.Y. July 8, 1999); see also Taylor v. Apfel, No. C–2–00–1333, 2002 WL 483529, at*7 (S.D. Ohio March 13, 2002); Garcia v. Astrue, No. 1:08-cv-01799-SMS, 2010 WL 1328890, at *7 (E.D.Cal. April 02, 2010); Melchior v. Apfel, 15 F.Supp.2d 215, 220 (N.D.N.Y. 1998).

The record reflects that plaintiff's doctors counseled her to stop smoking many times between February 2006 and January 2007,  the precise period during which the qualifying asthma attacks occurred, and that plaintiff failed to do so.  Therefore, even

though the ALJ did not make specific findings on the issue, his determination that plaintiff does not meet the Appendix 1 listing for asthma is supported by substantial evidence in the record.  Rivera v. Barnhart, No. 04-30131, 2005 WL 670538, at *5 (D. Mass. March 14, 2005) (failure to "make specific findings as to whether a claimant's impairments meets the requirements of a listed impairment is an insufficient reason in and of itself for setting aside an administrative finding.") (citing Senne v. Apfel, 198 F.3d 1065, 1067 (8th Cir. 1999)); Fiske v. Astrue, No. 10–40059–TSH, 2012 WL 1065480 at *9 (D. Mass. March 27, 2012) (collecting cases) (same).

### B.  RFC Determination

Next, plaintiff argues that the ALJ erred as a matter of law by not including any limitation for (1) concentration, persistence and pace; and (2) overhead reaching in the step 4 and 5 RFC determination despite having found them to be severe impairments at step 2 of the analysis.

### 1.  Mental Impairments

On the first point, the Commissioner uses a specific technique (known as "paragraph B" analysis) to evaluate the effect of a claimant's mental impairment on his or her social functioning, concentration, persistence and pace, and episodes of decompensation at steps 2 and 3. 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3). Here, while the ALJ did find that plaintiff had moderate difficulties under these criteria, he specifically noted that such limitations are not an "RFC assessment but are used to rate severity of [claimant's] mental impairments at step 2 and 3." On the other hand, the step 4 and 5 RFC determination requires a "more detailed assessment," and that the

17

ultimate residual functional capacity assessment made at step 4 and 5 "reflects the

degree of limitation ... found in the paragraph B mental function analysis."  He thus

included in the step 4 and 5 RFC determination that claimant be restricted to "simple

unskilled tasks ... less than occasional co-worker contact and less than incidental

public contact."

> Unskilled work is defined as:
>
> work which needs little or no judgment to do simple duties that can be learned
> on the job in a short period of time.... a person can usually learn to do the job in
> 30 days, and little specific vocational preparation and judgment are needed. A
> person does not gain work skills by doing unskilled jobs.

The commissioner has described the functioning required for unskilled work:

> The basic mental demands of competitive, remunerative, unskilled work include
> the abilities (on a sustained basis) to understand, carry out, and remember
> simple instructions; to respond appropriately to supervision, coworkers, and
> usual work situations; and to deal with changes in a routine work setting.

SSR 18-5, 1985 WL 56857 (S.S.A.), at *4.

By limiting plaintiff to "simple unskilled tasks" with minimal exposure to co-

workers and the general public, the ALJ adequately considered and incorporated

plaintiff's mental impairments, as determined in during his paragraph B analysis, into

the RFC assessment, and he implicitly determined that no further restrictions were

appropriate.  Cf. Ortiz v. Secretary of Health and Human Services, 890 F.2d 520, 526-

528 (1st Cir. 1989) (upholding ALJ's denial of benefits where ALJ carefully considered

claimant's nonexertional limitations in determining appropriate level of skilled work for

claimant in connection with the RFC analysis).

Substantial evidence supports the ALJ's RFC determination. When asked about her lack of concentration, plaintiff testified only that she occasionally gets sidetracked while doing word search puzzles and that sometimes she cannot remember if she has taken all her required medicines.  Further, Dr. McNally, determined that plaintiff was of average intelligence and had unimpaired concentration and recall.  Dr. Whitehorn and Dr. Aisenberg agreed that plaintiff had no limitations in understanding, adaptation or memory, although Dr. Aisenberg added the caveat that plaintiff could concentrate for two hours over an eight-hour period.  While the Adams report found marked limitations in activities of daily living, social functioning and concentration in contradiction to the aforementioned findings, the ALJ specifically discredited this report for a number of appropriate reasons (further addressed at Section III.D, infra).

## 2.  Reaching Overhead

As to plaintiff's second point, the ALJ determined at step 2 that among claimant's "severe impairments" was "rotator cuff tendinopathy," but neither the RFC nor the hypotheticals provided to the vocational expert at trial included any limitations on reaching overhead.  The Commissioner now asserts that a "limitation on overhead reading [sic] is not consistent with the medical evidence."  However, even though the ALJ was free to determine that the medical evidence did not support a "severe impairment" in connection with claimant's rotator cuff tendinopathy, he specifically found to the contrary.  He also summarized Drs. Poirier's and Purins' recommendations that plaintiff be limited to only "occasional" overhead reaching but did not explain why this limitation was absent from his ultimate RFC determination.

19

Plaintiff points out that such error cannot be considered harmless as the three occupations specifically identified by the ALJ as appropriate for plaintiff actually require "frequent reaching" according to the Dictionary of Occupational Titles ("DOT"). The Commissioner responds that "here state agency doctors only limited [plaintiff's] overhead reaching, not all reaching." While correct, this statement is of little help to the Commissioner because the DOT does not distinguish between reaching overhead and reaching in other directions, nor was any testimony in this regard elicited from the vocational expert. See Robertson v. Astrue, No. 1:09CV87-SRW, 2010 WL 3488637, at *2 (M.D. Ala. Aug. 31, 2010) (noting "DOT defines 'reaching' as 'extending the hand(s) and arm(s) in any direction,'" citing from the "Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles ('SCO')").

The relevant question is whether a decision to exclude a restriction on reaching from the RFC can be found to have been supported by substantial evidence where (1) the ALJ made an explicit finding that plaintiff has a severe impairment by virtue of her "rotator cuff tendinopathy;" and then (2) failed to address two uncontroverted medical expert reports that restrict plaintiff to only occasional reaching. I concluded that it cannot. See Lacroix v. Barnhart, 352 F. Supp. 2d 100, 112 (D. Mass. 2005) ("it is ultimately for the Commissioner to determine an individual's residual functional capacity, 20 C.F.R. §§ 404.1527(e)(2) & 416.927(e)(2), based on all of the relevant evidence, id. §§ 404.1545 & 416.945"); Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (ALJ was not at liberty to ignore medical evidence or substitute his own views for uncontroverted medical opinion); Rodriguez v. Sec'y of Health & Human Services, 647

F.2d 218, 224 (1st Cir. 1981) (even reports of advisory, nonexamining nontestifying

doctors entitled to "some evidentiary value"). Therefore, remand is proper to determine

(1) the extent to which plaintiff's ability to reach overhead is to be limited in the RFC;

and (2) whether any jobs exist in sufficient numbers in the local or national economy

applying the reformulated RFC.

In order to narrowly define the issues to be addressed upon remand, I continue

to address plaintiff's remaining alleged errors.

### C. Credibility Determination

Plaintiff asserts that the reasons the ALJ gave for discrediting her subjective

complaints are not supported by substantial evidence.  But her own testimony and the

medical record substantially support the ALJ's RFC finding that plaintiff could perform

sedentary work with certain restrictions (except for the deficiency previously noted in

Section B(2), supra, regarding overhead reaching).

During her testimony, plaintiff did not offer any reason why she would be

completely disabled from work despite numerous opportunities to do so in response to

the ALJ's questioning. In fact, she discussed her pain minimally and her daily activities

at great length. When asked why she is unable to work, the only specific reason she

identified was her breathing problem noting that when her asthma acts up she cannot

work, but she further clarified that her asthma was "pretty under control" due to her

medications and nebulizer treatments. She also described that her knee, back and

neck hurt her every day but that with medication the pain is a "four or three" and that

she was taking only ibuprofen for the pain. She also refused a knee brace recommended by her doctor because she felt it would be "uncomfortable to walk in." She noted standing is a "chore" and that she sometimes used a cane, but that she could sit comfortably for a couple of hours without having to reposition herself. She testified that she raises her leg "maybe twice a day" to the level of the couch "for maybe an hour or so," and then she "can get up and move around," and that five minutes into washing dishes and vacuuming she starts hurting and that it "hurts to pull back and forth with the vacuum cleaner."

Plaintiff also testified to extensive daily activities:  she occasionally babysits her two- and three-year old grandchildren, she frequently walks to the library, she cooks and does laundry which requires her to carry loads of clothing up the steps from her cellar. In function reports completed by plaintiff in 2007 and 2008, she stated she can shop, use public transportation, play cards, attend church, socialize with others, pay attention for one to two hours.  She goes out to bars and has a few drinks once or twice a month and occasionally goes out to eat.

In August 2008, an investigator with social security also observed plaintiff walk to Wal-Mart and back with a female companion, not appearing to be "in any physical distress" for a total of "approximately 3 miles" and that during the walk plaintiff smoked two cigarettes.

Even fully crediting all of plaintiff's subjective assertions of pain and functional limits, it is far from clear that a different RFC assessment would be required.

22

Nevertheless, to the extent a different result would obtain, the above coupled with the medical record amply supports the ALJ's credibility conclusion.  <u>Dupuis v. Secretary of Health and Human Services</u>, 869 F.2d 622, 623 (1st Cir. 1989) ("ALJ's credibility determination is owed 'considerable deference'").[4]

### D.  Dismissal of Medical Source Opinions Without Substantial Discussion

Finally the plaintiff argues that the ALJ improperly disregarded the Adams report which found marked limitations in plaintiff's social functioning. Plaintiff argues that the ALJ erred by (1) not listing examples of how the report is inconsistent with the record; (2) improperly speculating that the report is "probably grossly exaggerated;" (3) discrediting the report based in part based on the fact that it incorporated plaintiff's subjective allegations; (4) discrediting the report based in part on the fact that it incorporated plaintiff's physical limitations; (5) by not considering the "§ 1527 factors;" and (6) impermissibly inferring "how much treatment for pain a claimant should get" for her condition.

As previously discussed, the record amply demonstrates that the Adams report runs counter to the opinion of Dr. McNally based on her examination of plaintiff and those of Drs. Whitehorn and Aisenberg based on their review of plaintiff's medical record; all of whom found plaintiff had no limitations in understanding, adaptation or memory and only mild to moderate limitations dealing with social pressures. Plaintiff's

---

[4] The plaintiff carefully parses every statement the ALJ used to justify his credibility determination and raise numerous arguments against nearly all of them; however, because I find his ultimate determination supported by substantial evidence, any merit these contentions may have merely amounts to harmless error.

own functional assessments describing her daily activities and typical social interactions and testimony regarding the same strongly belie Ms. Adams' findings. Conflicts within the medical evidence are matters for the Commissioner to resolve. Irlanda Ortiz v. Sec'y of Health & Human Services, 955 F.2d 765, 769 (1st Cir. 1991) (citing Rodriguez v. Secretary of Health and Human Services, 647 F.2d 218, 222 (1st Cir.1981)).

Further, when evaluating medical reports based in large part on subjective accounts or descriptions, the ALJ may consider the nature, frequency and credibility of the underlying source material. See Rodriguez Pagan v. Secretary of Health and Human Services, 819 F.2d 1, 2 (affirming ALJ's decision to discredit opinions from two treating physicians where they "relied excessively on claimant's subjective complaints, rather than objective medical findings."); 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.").

For these reasons, the ALJ's decision to assign less weight to the Adams report than the other relevant mental health assessments in the record is supported by substantial evidence.

## IV. Conclusion

Plaintiff's motion to remand is ALLOWED for the limited purpose noted above.


| _____May 9, 2012_____ | _____/s/Rya W. Zobel_____ |
| DATE | RYA W. ZOBEL |

24

UNITED STATES DISTRICT JUDGE